UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MATHEW JAMES MIGHELL,

                    Plaintiff,

      v.

CITY OF EDMONDS, *et al.*,

                  Defendants.

CASE NO. C14-285-RSM-MAT

REPORT AND RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action brought under 42 U.S.C. § 1983.  Plaintiff Mathew Mighell alleges in this action that his constitutional rights and state law were violated during his apprehension and arrest by a City of Edmonds police officer in 2011.  Plaintiff named as defendants in his complaint the City of Edmonds, the City of Edmonds Police Department, the Chief of the Edmonds Police Department, and a number of additional individual defendants identified only as John or Jane Doe.  The Court ordered service of plaintiff's complaint on the City of Edmonds, the City of Edmonds Police Department, and the Chief of the Edmonds Police Department, as those were the only defendants identified with sufficient specificity to permit the Court to effectuate service.

REPORT AND RECOMMENDATION
PAGE - 1

Defendants now move for summary judgment. Plaintiff has filed a response in opposition to defendants' motion and defendants have filed a reply brief in support of their motion. The Court, having reviewed plaintiff's complaint, defendants' motion for summary judgment, plaintiff's response thereto, and the balance of the record, concludes that defendants' summary judgment motion should be granted, and that plaintiff's complaint and this action should be dismissed with prejudice as to plaintiff federal constitutional claims and without prejudice as to plaintiff's state law negligence claims.

## FACTUAL BACKGROUND

On May 29, 2011[1], City of Edmonds Police Sergeant Josh McClure was working the graveyard shift with his police canine, Dash, when he received a call from 911 dispatch regarding a silent burglary alarm at Romeo's Pizzeria in Edmonds. (Dkt. 31 at 2.) Sergeant McClure was aware that Romeo's had previously been the target of night-time burglaries and he therefore believed that the alarm was not accidental or inadvertent but, instead, indicated there was likely a burglary in progress. (*Id.*) Sergeant McClure arrived at the scene at 2:25 a.m., just moments after the call was dispatched, and he parked out of sight of the business. (*Id.*)

Once on the scene, Sergeant McClure made the decision to begin his investigation, without awaiting backup, in an effort to stop the burglary and catch the perpetrators. (*Id.*) Sergeant McClure also made the decision to get Dash out of the car with him because of heightened officer safety concerns associated with the type of crime he believed he was likely to encounter and because of the fact that there were no other officers to provide backup. (*Id.* at 2-3.) According to Sergeant McClure, nighttime commercial burglaries typically involve more

---

[1] Plaintiff alleges in his complaint that the incident occurred on April 1, 2011. (*See* Dkt. 6 at 4.) However, in his declaration submitted in opposition to the City of Edmonds' summary judgment motion he acknowledges that the incident occurred on May 29, 2011. (*See* Dkt. 37-1 at 1.)

REPORT AND RECOMMENDATION
PAGE - 2

sophisticated criminals who are more likely to be armed, are more likely to have assistance from other individuals, and are more likely to be prior felons with knowledge of how to thwart law enforcement.  (Dkt. 31 at 2-3.)  Commercial burglars are also more likely to carry tools such as pry bars, bolt cutters, and/or screwdrivers which can be used as weapons.  (*Id*. at 2.)

Sergeant McClure knew from past calls that the exterior freezer area of the business had been the target of previous burglaries and that there was access to that area from the north and from the west via brush and a gated fenced area.  (*Id*. at 3.)  Sergeant McClure and Dash approached the business from the north.  (*Id*.)  The area they were in was very dark and was bordered on the west by heavy brush.  (*Id*.)  Sergeant McClure could see cases of soda stacked near the fence, apparently outside the business property.  (*Id*.)  As Sergeant McClure advanced towards the business, he could see a man maneuvering around the exterior freezer area loading cases of soda onto a hand truck.  (*Id*.)  As he moved closer to the fence near where the soda was stacked, Sergeant McClure could see a pair of bolt cutters on the ground.  (*Id*.)  Sergeant McClure then saw the man begin to move towards him with the hand truck.  (*Id*.)

Officer McClure whispered into his radio for assistance as the man moved closer.  (*Id*.)  Based on the silent alarm, the bolt cutters, the soda which was already stacked outside the business property, and the suspect who was in the process of removing more property from the business, Sergeant McClure concluded that he was, in fact, observing a commercial burglary-in-progress.  (*Id*.)  He also concluded that the suspect was moments away from discovering him.  (*Id*.)  At that juncture, Sergeant McClure could not tell if the suspect was armed and he was concerned that there may be multiple suspects in the area given that the soda was stacked in a fashion which led him to conclude that the observed suspect was moving the soda to a location where someone else could haul it away.  (Dkt 31 at 4.)

REPORT AND RECOMMENDATION
PAGE - 3

Once the man came into full view, Sergeant McClure trained his flashlight on the suspect and announced "Police K9! Get on the ground!" (*Id*.) Sergeant McClure could see at that point that the suspect appeared to be substantially larger than him, standing approximately 6'5" tall and weighing approximately 240 lbs. (*Id*.) The suspect did not immediately comply with Sergeant McClure's commands to get on the ground, he instead put the soda he was carrying on the ground and began to back up. (*Id*.) Sergeant McClure repeated his commands, but the suspect made no effort to comply. (*Id*.) It appeared to Sergeant McClure that the suspect was looking past him as if he was considering his options. (*Id*.) This caused Sergeant McClure concern that criminal associates of the suspect may be behind him. (*Id*.) K-9 Dash was, at this juncture, barking aggressively at the suspect but the suspect still made no effort to comply with Sergeant McClure's commands for him to get on the ground. (*Id*.)

When the suspect failed to comply with his commands, Sergeant McClure released K-9 Dash to aid him in apprehending the suspect. (*Id*.) Sergeant McClure based his decision to release Dash on several factors including the nature of the crime, a felony-in-progress, the suspect's significant size advantage, the suspect's failure to comply with commands that he get on the ground, concerns that the suspect could be armed and could have criminal associates in the vicinity, and the fact that Sergeant McClure did not have any back-up present. (*Id*.) Sergeant McClure determined that utilizing Dash was the best option under the circumstances because other options, such as using his taser, would have been impractical and would have compromised his ability to use his firearm if necessary. (Dkt. 31 at 4.) Sergeant McClure also believed, based upon his experience, that K-9 Dash was unlikely to cause serious injury. (*Id*.)

After being released by Sergeant McClure, K-9 Dash made contact with the suspect. (*Id*.) Dash first made contact with the suspect's left wrist as the suspect tried to push Dash away.

REPORT AND RECOMMENDATION
PAGE - 4

1  (*Id*.)  Dash and the suspect fell to the ground and as Dash attempted to gain control of the

2  suspect, the suspect continued trying to fight off the dog and the dog made contact with both of

3  the suspect's legs.  (*Id*. at 4-5.)  The suspect then yelled that he was giving up and Sergeant

4  McClure ordered Dash "out."  (*Id*. at 5.)  Dash released the suspect and Sergeant McClure

5  grabbed Dash and pulled him away while ordering the suspect to get onto his stomach.  (*Id*.)

6  Several others officers who had by then arrived on the scene took the suspect, Mr. Mighell, into

7  custody. (*Id*.)

8         In accordance with Edmonds Police Department policy requiring all subjects contacted

9  by police dogs to be evaluated, Sergeant McClure called for Fire/EMS and a supervisor to come

10  to the scene to evaluate plaintiff.  (*Id*. at 5.)  Other officers searched plaintiff and found a knife

11  on his person.  (*Id*.)  They also located nearby a full Halloween-style mask and bolt cutters with

12  the name "Matt" on them.  (*Id*.)  Fire/EMS evaluated Mr. Mighell and found dog bites on his left

13  wrist, his left thigh, shin, and calf, and his right knee.  (*Id*.)  The EMT's transported Mr. Mighell

14  to Swedish Hospital where he was evaluated and determined to be fit for custody.  (*Id*.)  Mr.

15  Mighell was then transported to the Snohomish County Jail where he was booked for second

16  degree burglary.  (*Id*.)

## DISCUSSION

18         Plaintiff alleges in his complaint that defendants used excessive force in effectuating his

19  arrest, and that he suffered physical and emotional injury as a direct and proximate result of

20  defendants' alleged misconduct.  (*See* Dkt. 6 at 4 and 9-11.)  As the Court noted above, plaintiff

21  identified multiple defendants in his complaint but only three defendants, the City of Edmonds,

22  the City of Edmonds Police Department, and the Chief of Police for the City of Edmonds, were

23  identified with sufficient specificity to permit the Court to effectuate service.

REPORT AND RECOMMENDATION
PAGE - 5

Defendants argue in their motion for summary judgment that the canine handler, Sergeant Josh McClure, is entitled to qualified immunity for releasing the police dog in the circumstances presented, that the City of Edmonds is entitled to summary judgment because there is no evidence of any city custom or policy that proximately caused the alleged constitutional violations, and that any remaining unnamed defendants are entitled to summary judgment because there is no evidence that any other officers at the scene violated plaintiff's constitutional rights.

### Summary Judgment Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are facts which might affect the outcome of the pending action under governing law. *See Anderson*, 477 U.S. at 248. Genuine disputes are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the existence of the elements essential to his case. *See* Fed. R. Civ. P. 56(e). A mere scintilla of evidence is insufficient to create a factual dispute. *See Anderson*, 477 U.S. at 252. In ruling on a motion for summary judgment, the court may not weigh the evidence or make credibility determinations. *Id*. at 248.

/ / /

REPORT AND RECOMMENDATION
PAGE - 6

1

<u>City of Edmonds Police K-9 Unit</u>

2

Plaintiff asserts that on the night he was apprehended by City of Edmonds police, the

3

Edmonds K-9 officer ordered the K-9 to attack without announcing their presence or allowing

4

plaintiff a chance to give-up. (Dkt. 6 at 5.) Plaintiff further asserts that the K-9 officer allowed

5

the K-9 to continue attacking well after plaintiff was down and subdued. Defendants argue in

6

their summary judgment motion that canine handler Josh McClure[2] is entitled to qualified

7

immunity in this action.

8

Qualified immunity protects § 1983 defendants from liability for civil damages so long as

9

their conduct does not violate a clearly established constitutional or statutory right of which a

10

reasonable person would have known. *See  Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In

11

*Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-prong test to be

12

applied in evaluating claims of qualified immunity: (1) whether the facts alleged, when taken in

13

the light most favorable to the party asserting the injury, show that the defendant's conduct

14

violated a constitutional right; and (2) whether the right was clearly established. "The relevant,

15

dispositive inquiry in determining whether a right is clearly established is whether it would be

16

clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

17

*Saucier*, 533 U.S. at 202.

18

The Court begins its analysis by first considering whether the conduct in question

19

violated any constitutional right. The standard for analyzing claims of excessive force was

20

established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). *Graham* instructs

21

22

23

[2]  Plaintiff identified the "Edmonds Police K-9 Unit" as a defendant in his complaint. Defendants, in their summary judgment papers, identify Sergeant Josh McClure as the canine handler involved in the incident which gives rise to this action. Sergeant McClure was never served in this action because plaintiff failed to identify him with sufficient specificity in his complaint. Nonetheless, counsel has appeared on behalf of Sergeant McClure and has not raised any defenses based on insufficiency of service of process.

REPORT AND RECOMMENDATION
PAGE - 7

that such claims are to be evaluated under the Fourth Amendment's reasonableness standard: "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397 (citation omitted).

The Court cautioned that reasonableness must be assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id*. at 397.   The Court made clear that proper application of the reasonableness standard requires careful consideration of the specific facts and circumstances of each individual case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.

The Ninth Circuit has refined this standard somewhat.  Specifically, the Ninth Circuit has made clear that when evaluating a claim of excessive force, the first step must be assessment of "the quantum of force used."  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). This is so "because the factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure."  *Id.* (internal quotation and citation omitted).

While a canine is certainly capable of inflicting serious injury, *see e.g. Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), the record before this Court reflects that the amount of force used against plaintiff was moderate.  K-9 Dash made contact with plaintiff's wrist and both

REPORT AND RECOMMENDATION
PAGE - 8

of his legs.  The record demonstrates that Dash made contact with plaintiff's wrist when plaintiff tried to push Dash away, and then made contact with both of plaintiff's legs as Dash tried to gain control of plaintiff on the ground while plaintiff attempted to fight him off.  (Dkt. 31 at 4-5.)  According to Sergeant McClure, after Dash made contact with both of plaintiff's legs, plaintiff yelled that he was giving up and Sergeant McClure commanded Dash to release plaintiff.  (*Id*. at 5.)  Dash immediately obeyed the command and Sergeant McClure pulled Dash away.  (*Id*.)

Plaintiff, in his declaration in opposition to defendants' summary judgment motion, states that "[o]nce the dog was sent, it was allowed to continue to attack for some time, after it should have been clear to the officer that I was trying to give up."  (Dkt. 37-1 at 2.)  Plaintiff fails to make clear what "some time" means in the context of this incident and he does dispute that Sergeant McClure commanded Dash to release plaintiff as soon as plaintiff yelled that he was giving up.  Moreover, the injuries suffered by plaintiff do not suggest a sustained attack but, rather, are consistent with Sergeant McClure's description of how Dash's contact with plaintiff unfolded.

Attached to Sergeant McClure's declaration in support of defendants' summary judgment motion are photographs Sergeant McClure took of plaintiff's injuries while plaintiff was at the hospital following his arrest.  (*See* Dkt. 31, Attach A.)  The photographs appear to show clear bite marks on plaintiff's right leg and left calf, a puncture wound on the inside of his left thigh, and abrasions on plaintiff's left wrist, though no significant tearing of the skin in those areas where the dog made contact.  (*Id*.)  Plaintiff states in his declaration that the photographs submitted by defendants do not reveal the full extent of his injuries, particularly those to his right knee.  (Dkt. 37-1 at 3.)  Plaintiff claims that he suffered further damage "inside the knee area" which has resulted in ongoing pain requiring cortisone shots and drug therapy but plaintiff

REPORT AND RECOMMENDATION
PAGE - 9

provides no actual medical evidence demonstrating that any ongoing concerns with his right knee are, in fact, related to the dog bite.[3]  In sum, while plaintiff clearly sustained injuries as a result of his contact with K-9 Dash, it does not appear as though he sustained any serious injury.

The Court next turns to the specific factors cited in *Graham* in order to assess whether the governmental interests at stake justify the amount of force used.  The first factor is the severity of the crime at issue.  Plaintiff was observed committing a felony offense; *i.e.*, the burglary of a commercial establishment.  While burglary is not necessarily a violent crime, nighttime commercial burglaries, according to Sergeant McClure, present significant officer safety concerns.  (Dkt. 31 at 2.)  Sergeant McClure explains that such burglaries often involve more sophisticated criminals who are more likely to be armed and to carry burglar tools such as pry bars, bolt cutters and/or screwdrivers that can be used as weapons.  (*Id*.)  Sergeant McClure further explains that criminals involved in such burglaries are also more likely to have assistance from others and are more likely to be prior felons with more extensive knowledge of how to thwart law enforcement.  (*Id*.)  Sergeant McClure identified bolt cutters sitting on the ground near the stacked soda outside the fence, but could not tell if plaintiff was otherwise armed.  (*Id.* at 3.)  Given the lack of information as to whether plaintiff might have been armed, in combination with the knowledge that the criminal activity plaintiff was engaged in would typically involve the use of tools which might be used as weapons, one of which he had already identified, the situation posed sufficient danger to warrant the use of force.

The second factor is whether plaintiff posed an immediate threat to the safety of officers or others.  The Ninth Circuit has held that this factor is the most important of the three specific

---

[3]  The Court notes that the picture of plaintiff's right knee shows a mark which extends down from the bite mark for a number of inches, but it is not clear that the mark is related in any way to the incident in question here. The mark appears as though it could be a scar from a prior injury.

REPORT AND RECOMMENDATION
PAGE - 10

factors identified in *Graham*. *See Chew v. Gates,* 27 F.3d at 1441.  Sergeant McClure came

upon plaintiff in the early hours of the morning when it was dark, he had no back-up, and he had

no way of knowing whether plaintiff had any criminal associates in the area.  (Dkt. 31 at 3-4.)

When Sergeant McClure got to the point where he could see plaintiff, he noted that plaintiff was

substantially larger than he was; *i.e.*, approximately 5" taller and 70 lbs heavier.  (*Id.* at 4.)

Plaintiff did not immediately comply with the commands to get on the ground and Sergeant

McClure's perception was that plaintiff was looking past him as if he were considering his

options.

Plaintiff states in his declaration that he was at least 15 feet away from Sergeant McClure

when the flashlight was shined on him, and not just "a few feet" as Sergeant McClure indicated

in his declaration, and that from where Sergeant McClure stood he could have "ducked behind" a

nearby chain link fence to increase his sense of safety rather than release the dog.  (Dkt. 37-1 t

2.)  Plaintiff also suggests that the fact that Sergeant McClure was armed with a police dog, a

taser, and a gun, as well as access to a chain link fence barrier, undermines Sergeant McClure's

assertion that plaintiff's size caused him to be concerned for his safety.  (*Id.*)  Plaintiff contends

that the bolt cutters were too far away to be used as a weapon and that Sergeant McClure could

see both of his hands and could therefore see that plaintiff was not holding a weapon.  (*Id.*)

Of course the reasonableness query turns not on what plaintiff, in hindsight, thinks

Sergeant McClure should have perceived, but what Sergeant McClure actually perceived as

events were unfolding.  The fact that Sergeant McClure may not have seen a weapon in

plaintiff's possession did not eliminate the possibility that plaintiff had access to another weapon

and, in fact, the officers who searched plaintiff after he was taken into custody found a knife on

his person.  Had plaintiff been armed, as Sergeant McClure's experience with such crimes

REPORT AND RECOMMENDATION
PAGE - 11

suggested he might be, the chain link fence which plaintiff maintains should have given Sergeant McClure an increased sense of safety would have provided little protection at all.  And, of particular significance, Sergeant McClure had no backup on scene when he released K-9 Dash and plaintiff's actions caused him to be concerned that plaintiff had criminal associates in the vicinity.  Under all of these circumstances it is reasonable to conclude that plaintiff posed an imminent threat to officer safety.

The third factor is whether plaintiff was actively resisting arrest or attempting to evade arrest by flight.  While there is no evidence that plaintiff attempted to flee, he did fail to comply with Sergeant McClure's commands to get on the ground and he did actively resist by attempting to fight off Dash before finally giving up.  Plaintiff states in his declaration that the dog was barking so loudly that he did not hear Sergeant McClure announce himself or give plaintiff any command. (Dkt. 37-1 at 2.)  Plaintiff maintains that he would have complied with the command if he had heard it.  (*Id*.)  However, regardless of whether plaintiff heard the command, Sergeant McClure's objective observation was that plaintiff failed to comply with the command.  Sergeant McClure also noted that plaintiff seemed to be considering his options when first confronted which could reasonably cause Sergeant McClure to believe plaintiff might attempt to flee.

The evidence presented by Sergeant McClure in support of defendants' motion for summary judgment amply demonstrates that each of the three factors identified in *Graham* weigh in his favor.  Neither plaintiff's arguments, nor the statements made in his declaration, create any genuine issue of material fact as the whether the amount of force used by Sergeant McClure was reasonable in the circumstances presented.  Plaintiff therefore has not established any violation of his federal constitutional rights and, thus, the Court need not address the second part of the qualified immunity analysis.  Sergeant McClure is entitled to judgment as a matter of

law with respect to plaintiff's excessive force claim.

<u>City of Edmonds</u>

Plaintiff identifies the City of Edmonds as a defendant in his complaint and asserts that the City of Edmonds is liable in this action for his failure to adequately train and supervise its employees. Defendants appears to argue in their summary judgment motion that plaintiff's claim against the City of Edmonds should be dismissed because plaintiff fails to show that that the City of Edmonds was the moving force behind any constitutional violation. Defendants also argue that plaintiff's claim fails on the merits.

A local government unit or municipality can be sued as a "person" under § 1983. *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691 (1978). However, a municipality cannot be held liable under § 1983 solely because it employs a tortfeasor. *Id.* A plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" that caused his or her injury. *Bryan County Commissioners v. Brown*, 520 U.S. 397, 403 (1997), *citing Monell* 436 U.S. at 694.

In *Bryan County Commissioners*, the Supreme Court explained that

> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County Commissioners*, 520 U.S. at 404.

As plaintiff's claim against the City of Edmonds is based solely on the actions of the City of Edmonds K-9 unit; *i.e.*., Sergeant McClure and Dash, and as plaintiff has not established that the K-9 unit violated his federal constitutional rights, plaintiff's claim against the City of

REPORT AND RECOMMENDATION
PAGE - 13

Edmonds necessarily fails.  The City of Edmonds is entitled to judgment as a matter of law.

<u>City of Edmonds Chief of Police</u>

Plaintiff also asserts in his complaint that the Chief of Police of the City of Edmonds Police Department is liable in this action based upon his lack of supervision, presumably of Sergeant McClure.  Defendants do not specifically address the claim against the Chief of Police. However, the claim is readily disposed of even in the absence of any argument from defendants.

It is well established that a defendant cannot be held liable under § 1983 solely on the basis of supervisory responsibility or position.  *Monell,* 436 U.S. at 691-694.  Rather, a plaintiff must allege that a defendant's own conduct violated the plaintiff's civil rights.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-90 (1989).  A supervisor may be held liable under § 1983 "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (quoting *Jackson v. City of Bellingham*, 268 F.3d 646, 653 (9th Cir. 2001)).   The Ninth Circuit has explained that "[s]upervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others."  *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

As explained above with respect to the City of Edmonds, given plaintiff's failure to demonstrate that Sergeant McClure violated his federal constitutional rights, any claim that the Chief of Police failed to properly train and/or supervise Sergeant McClure also necessarily fails. The Chief of Police is entitled to judgment as a matter of law.

/ / /

REPORT AND RECOMMENDATION
PAGE - 14

John Doe Defendants

Defendants, in their motion for summary judgment, specifically seek dismissal of all claims against the "John Doe" defendants.   Plaintiff never identified the proposed Doe defendants and no such individuals were ever served in this action.   Accordingly, the Doe defendants are not deemed parties to this action.   Even if the Doe defendants were deemed proper parties, defendants correctly note in their summary judgment motion that there are no facts in the record demonstrating that any individual officer, aside from Sergeant McClure, in any way participated in the events giving rise to plaintiff's excessive force claim.   Thus, any intended claims against the Doe defendants are properly dismissed.

Pendant State Law Claims

Plaintiff appears to assert in his complaint that defendants violated not only his federal constitutional rights but state law as well.   The Supreme Court has stated that federal courts should refrain from exercising their pendent jurisdiction when the federal claims are dismissed before trial.   *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).   Because plaintiff's federal constitutional claims are subject to dismissal based upon plaintiff's failure to establish any violation of his federal constitutional rights, this Court should decline to exercise jurisdiction over plaintiff's state law claims of negligence.

CONCLUSION

Based on the foregoing, this Court recommends that defendants' motion for summary judgment be granted, and that plaintiff's complaint and this action be dismissed with prejudice as to plaintiff's federal constitutional claim and without prejudice as to plaintiff's state law negligence claims.

/ / /

REPORT AND RECOMMENDATION
PAGE - 15

1

## DEADLINE FOR OBJECTIONS

2

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

3 served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

4 and Recommendation is signed.  Failure to file objections within the specified time may affect

5 your right to appeal.  Objections should be noted for consideration on the District Judge's

6 motions calendar for the third Friday after they are filed.  Responses to objections may be filed

7 within **fourteen (14) days** after service of objections.  If no timely objections are filed, the

8 matter will be ready for consideration by the District Judge on **February 13, 2015**.

9

DATED this 22nd day of January, 2015.

10

11

_____

Mary Alice Theiler

12 Chief United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION
PAGE - 16